UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                  :

JANE DOE,                      :

               Plaintiff,      :          13 Civ. 6287 (PAE)

                      :          OPINION & ORDER

          -v-           :

DELTA AIRLINES, INC.,     :

                Defendant.    :

-----------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/10/15

PAUL A. ENGELMAYER, District Judge:

     In this diversity action, plaintiff Jane Doe sues defendant Delta Airlines, Inc. ("Delta")

for events that occurred during a flight delay, culminating in her arrest for public intoxication.

Doe brings claims for battery, defamation, false arrest, malicious prosecution, and negligence.

She seeks compensatory and punitive damages.

     Before the Court are competing motions for summary judgment.  Delta moves against all

of Doe's claims, claiming they are preempted by the Airline Deregulation Act, 49 U.S.C. §

41713(b)(1) ("ADA") and the Federal Aviation Act, 49 U.S.C. § 44902 ("FAA"), and, in the

alternative, that there is insufficient evidence to support these claims.  Doe moves for summary

judgment on her battery claim.  For the reasons that follow, the Court grants Delta's motion to

for summary judgment as to all claims except Doe's battery claim.  As to that claim, the Court

denies both parties' motions for summary judgment.

# I.      Background[1]

## A.      Factual Background

On September 8, 2012, Doe had a ticket for a first-class seat on a Delta flight, scheduled to leave Ronald Reagan Washington National Airport in Arlington, Virginia, for LaGuardia Airport in New York.  Brauchle Aff., Ex. D ("Passenger Name Record").  The flight, scheduled to depart at 3 p.m., was operated by a Delta partner, Shuttle America Corp.  Martinez Aff., Ex. E ("Hanson Dep."), at 7.  At about 2:35 p.m., Doe boarded the plane from Gate 17, and sat in her assigned window seat.  Brauchle Aff., Ex. C ("Doe Dep."), at 71.  Due to bad weather, the flight was delayed.  *Id.* at 72–73.

---

[1] This account is drawn from the parties' submissions in support of and in opposition to the instant motions, including Delta's statement of material facts (Dkt. 99) ("Delta 56.1"); the Affirmation of Louis R. Martinez in support of Delta's motion (Dkt. 98) ("Martinez Aff."), and the exhibits attached thereto; Doe's statement of material facts (Dkt. 103) ("Doe 56.1"); the Affirmation of James R. Brauchle in support of Doe's motion (Dkt. 102) ("Brauchle Aff."), and the exhibits attached thereto; Delta's response to Doe's 56.1 statement (Dkt. 106) ("Delta Resp. 56.1"); the Affirmation of Louis R. Martinez in Opposition to Doe's motion (Dkt. 105) ("Martinez Resp. Aff."), and the exhibits attached thereto; Doe's response to Delta's 56.1 statement (Dkt. 109) ("Doe Resp. 56.1"); the Affirmation of James R. Brauchle in opposition to Delta's motion (Dkt. 108) ("Brauchle Resp. Aff."), and the exhibits attached thereto; Delta's reply to Doe's response to Delta's 56.1 statement (Dkt. 119) ("Delta 56.1 Reply"); the Affirmation of Louis R. Martinez in further support of Delta's motion (Dkt. 118) ("Martinez Reply Aff."), and the exhibits attached thereto; Doe's reply to Delta's response to Doe's 56.1 statement (Dkt. 116) ("Doe 56.1 Reply"); the Affirmation of James R. Brauchle in further support of Doe's motion (Dkt. 115) ("Brauchle Reply Aff."), and the exhibits attached thereto.

Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

Doe and Delta dispute the ensuing events, highlighting different evidence adduced in discovery.

### 1. Delta's Account of the Facts

According to Delta, the flight attendants on duty noticed Doe crying as she boarded the plane. Martinez Aff., Ex. D ("Shuttle America Flight Attendant Report"), at 3. Jamie Hanson, the rear flight attendant, testified that she approached Doe, attempting to speak with her. Hanson Dep. 8. Hanson saw Doe rummaging through her purse and holding pill bottles in her hands. *Id.* at 8–9. Hanson also observed that Doe was attempting to conceal a clear Delta plastic cup, which contained brown liquid. *Id.* at 9.

During the delay, Tonyeka Williams, the lead flight attendant responsible for the first-class cabin, saw Doe take a pill. Martinez Aff., Ex. F ("Williams Dep."), at 19–20. According to Williams, Doe, after taking the pill, began to ask the flight attendants the same questions repeatedly and appeared disoriented, to the point that the flight attendants became concerned about her behavior. *Id.* at 20–22.

The crew eventually informed the flight's passengers that the flight would be further delayed; passengers were given the option to stay aboard the plane or to deplane and wait in the terminal. *Id.* at 28. Williams then saw Doe take another pill; she and Hanson informed Bart Moseley, the flight's captain, of their observations about her. *Id.* at 28–29. According to Williams, Moseley instructed the flight attendants to monitor Doe. *Id.* at 29.

Because of the weather delay, all passengers and the flight crew disembarked the plane. *Id.* at 30, 32. Doe testified that she then went to the Tidewater Landing restaurant, located in the terminal. Doe Dep. 76. Doe's receipt reflects that the restaurant opened her check at 5:44 p.m., and that she ordered four glasses of wine (all Chardonnay). Martinez Aff., Ex. I ("MacCracken

Dep."), at 43–45, 48; Martinez Aff., Ex. J ("Doe's Tidewater Landing Receipt").  Bob

MacCracken, the restaurant's manager, testified that servers at Tidewater Landing are instructed

to pour at least six ounces of wine per glass, but usually pour more than that amount.

MacCracken Dep. 45.  Doe also ordered an appetizer of brie cheese, topped with raspberry

sauce, which came with apples and a baguette.  MacCracken Dep. 44; Doe's Tidewater Landing

Receipt.  Doe's check was closed out at 7:08 p.m.  Doe's Tidewater Landing Receipt;

MacCracken Dep. 48.

During the delay, Doe testified, she went to the boarding gate several times to ask

whether she would retain her first-class seat assignment on the next flight to New York.  Doe

Dep. 82.  Darren Miller, a Delta operations floor manager or "Red Coat," testified that some 30

to 45 minutes after the passengers deplaned, he told Doe that the gate for her flight had changed

to Gate 15.  Martinez Aff., Ex. N ("Miller Dep."), at 37.  Miller later approached Gate 15 and

observed the following of Doe:

> As I arrived, again, she was pounding on the desk and she was . . . pretty loud
> talking to the agent and saying I need to be on this flight, I need to be on this flight,
> you're going to put me on this flight.  And I do recall the agent saying ma'am, if
> you don't . . . calm down the police has to be called.  We need you to calm down
> so we can get this resolved.  And at that point she said call whoever you need to
> call, but y'all are going to put me on this flight and I'm an attorney and I will make
> you—you know, make this worse than what it is.  And at that point, again, that's
> when the police showed up, so that's as much as I heard then.

*Id.* at 99.

A Delta gate agent, Virginia McLeod, testified about her interaction with Doe at the Gate

15 podium:

> **DOE'S COUNSEL:**  And with that first interaction with her . . . what observations,
> if any, did you make about her behavior?
>
> **MCLEOD:**  She was visually upset.  She seemed a little off to me.  She seemed to
> be slurring her words a little.  That was it.

4

> **DOE'S COUNSEL:** Okay.  And when you say she was . . . visually upset, can you describe what you mean by "visually upset"?
>
> **MCLEOD:** She looked angry.  She had a scowled face.
>
> **DOE'S COUNSEL:** All right.  And you mentioned that she seemed a little off.  Can you describe what you mean by that?
>
> **MCLEOD:** She—due to the slurring of her words, she just didn't seem—she just seemed off.  She seemed that—not as rational as someone who would be in their good state of mind.

Martinez Aff., Ex. L ("McLeod Dep."), at 25–26.  McLeod further testified that when Doe asked her whether she would retain her first-class priority ticket on the next flight, McLeod told her that she would not.  *Id.* at 27–28.  McLeod observed that Doe was visibly angry, but after this encounter, she walked away.  *Id.* at 27–28.

Hanson, the rear flight attendant, also saw Doe at the gate.  Hanson Dep. 17.  Hanson testified that Doe was aggressive, slurring her speech, and yelling at the Delta representatives working at the gate.  *Id.* at 17–19.  As Hanson described Doe's conduct, Doe "set the bar" for unruly behavior by a passenger.  *Id.* at 18.  Hanson reported Doe's conduct to Moseley, the flight's captain.  *Id.* at 22–23.  Moseley ordered the Delta gate agents to deny Doe boarding.  Moseley Dep. 16.

Eventually, two police officers from the Metropolitan Washington Airports Authority Police ("MWAAP") approached Doe at Gate 15.  Martinez Aff., Ex. P ("Anderson Dep."), at 26.  Officer Michael J. Anderson, the eventual arresting officer, testified that at around 7 p.m., the MWAAP dispatch center directed him to respond to Gate 15.  *Id.* at 23–24.  When he approached the gate, he saw Doe arguing with a Delta gate agent; Doe's demeanor did not change when he and Officer Tanika Brown intervened.  *Id.* at 13–15, 26–28.  Officer Anderson testified that his attention was drawn to Doe because of her loud voice.  *Id.* at 31.  He added that Doe was:

> unsteady on her feet, kind of using the desk as support.  When she stood by herself,
> she was a little bit swayed.  When I introduced myself and she was talking over me,
> she smelled of an alcoholic beverage emanating from her person.  She had slurred
> speech.

*Id.* at 31–32.  Officer Anderson also testified that:

> [w]hen she wouldn't respond to me at all and she was still going about her
> conversation or how upset she was, I made the decision that she is unable to take
> care of herself in that time, so I placed her under arrest and told her she was under
> arrest for [being] drunk in public.

*Id.* at 37.  As to the arrest, Officer Anderson attested that it was his decision to arrest Doe.  That

decision, he testified, was "wholly independent of anyone else and based upon [his] authority."

*Id.* at 40.

> Miller, the Delta operations floor manager, made similar observations of Doe at that time:

> At that point I do recall [her] saying . . . that she was an attorney to the police, she
> was real loud with the police as well.  Her tone did not change at all when the police
> arrived.  She was . . . still loud, she was real aggressive.  I do recall it was two
> officers there, one was a Caucasian male and one was an African-American female.
> And as they approached her—the African-American female actually approached
> her first.  And as she was talking to [Doe], [Doe] was still being loud and boisterous
> to her and very disrespectful to her, and she told her not to touch her.  And at that
> point that's when I saw the Caucasian male officer then interact.  And then, again,
> I turned away at that point because I was called on the radio.  And by the time I
> came . . . back to see what the situation was . . . she was handcuffed at the point and
> the Caucasian male officer was escorting her with the handcuffs at that point.

Miller Dep. 100–101.  Miller further testified that the flight had finished boarding at the time the

police interacted with Doe.  *Id.* at 103.

   After the arrest, Officer Anderson presented Doe to a magistrate of the Arlington County

Criminal Court, who found probable cause for the arrest.  Anderson Dep. 83; Martinez Aff., Ex.

Q ("Doe's Arrest Warrant").

### 2. Doe's Account of the Facts

Doe testified that after boarding the initial flight, the passengers were seated in the plane for about two hours. Doe Dep. 73. The flight crew served Doe only ice water while on the plane. Williams Dep. 58. Doe testified that, while on board, she took a Flexeril pill, which her chiropractor had prescribed for her back pain, Doe Dep. 32, 34, 74–75, and asked attendants for updates on the flight's status. *Id.* at 73–74.

Williams, the lead flight attendant, saw Doe visit the restroom at least twice, and that "[e]ach time she walked in the upright position and did not appear to be off-balance." Shuttle America Flight Attendant Report 3; *see also* Williams Dep. 21. Williams testified that she never smelled any alcohol on Doe. *Id.* at 27. Hanson, the other flight attendant, attested that she never saw Doe eat or drink anything and never smelled alcohol on Doe. Hanson Dep. 12, 16. Hanson did not ask Doe if she had consumed any alcohol, if she had any disabilities or medical conditions, or if she had taken any medication. *Id.* at 12.

At about 4:45 p.m., Doe disembarked, and was told by Delta representatives to stay in the terminal. Doe Dep. 75–76. Doe testified that Delta representatives suggested that passengers wait at the Tidewater Landing restaurant. *Id.* at 76. Doe testified that she initially ordered a glass of wine. *Id.* at 62, 77. She then ordered a fruit and cheese salad and a second glass of wine. *Id.* at 62, 77. Supporting her denial of intoxication, Doe notes that MacCracken, Tidewater Landing's manager, testified that the restaurant's servers are trained and instructed to not serve intoxicated passengers. MacCracken Dep. 64–66.

During the delay in the terminal, Doe approached Gate 17 and spoke with Miller, the Delta operations floor manager. Miller directed Doe to Gate 15; he testified that Doe was "cordial," did not curse, and was not loud. Miller Dep. 37–39.

Doe testified that she then went to Gate 15 and spoke to a Delta gate agent, an African-American male who appeared to be about 20 to 30 years old.  Doe Dep. 82.  Doe's interactions with that agent are central to her claims, and indeed that agent's actions form the sole basis of Doe's claims for battery and defamation.  However, the parties have not identified a gate agent meeting that description who interacted with Doe.  Delta did supply Doe's counsel with a list of the names of Delta employees on duty that day in the relevant area "who might fit the description" given by Doe, but Doe elected not to depose them.  Dkt. 91 ("2/27/15 Tr."), at 37–39.  Notably, as described further below, Williams, the lead flight attendant, and Officer Anderson both did recall observing an agent meeting that description at the gate that day interacting with Doe.  *See* Williams Dep. 35; Anderson Dep. 26–27.

Doe asked the African-American male gate agent if she would still retain her first-class seating on the next flight.  Doe Dep. at 86.  Doe testified that she was "very concerned" about losing her first-class seat because of her back and knee pain.  *Id.* at 80.  The agent, Doe testified, replied that he would decide how the flight was to be boarded.  *Id.* at 86–87.

According to Doe, the agent was "unpleasant," "agitated," and in a "poor mood."  *Id.* at 86.  Doe walked away from the gate, but the agent followed and grabbed her shoulder from behind.  *Id.* at 91–92.  Doe testified that the agent said to her: "I think that you've been drinking."  *Id.* at 92.  Doe stated, "Well, yes.  I've had a glass of wine, but I haven't really been drinking if you talk to the waitress over there"; she then pointed toward the waitress who had served her at the Tidewater Landing restaurant.  *Id.* at 92–93.  Doe testified that she was "mortified" because the agent had caused a scene that attracted the attention of surrounding passengers.  *Id.* at 92–93.

8

Doe testified that, in addition to the African-American male gate agent, a Caucasian woman worked at Gate 15 alongside him, but Doe did not interact with her. *Id.* at 83. McLeod, a female Delta gate agent who worked at Gate 15 that day, however, testified that she interacted with Doe. McLeod Dep. 25. McLeod testified that Doe "was angry" but she did not shout or curse. *Id.* at 26. McLeod testified that she did not feel threatened as a result of her interaction with Doe. *Id.* at 28.

At about 7 p.m., the flight crew was notified that the next flight to New York was scheduled to depart. Williams Dep. 33. Williams, the lead flight attendant, testified that when she arrived at Gate 15, she saw Doe, who was "polite," and recalled that nothing appeared "out of the ordinary." *Id.* Williams also testified that she saw an African-American male gate agent at Gate 15's podium. *Id.* at 35. Zoila Sanchez-Concha, a Delta agent who was logged in at Gate 15 between 7:07 p.m. and 7:53 p.m., attested that she did not remember any disturbances at the gate that day or any arrest. Brauchle Resp. Aff., Ex. J ("Sanchez-Concha"), at 16.

At about 7:45 p.m., boarding for the next flight to New York began. Doe Dep. 87. Doe approached the gate; the African-American male agent with whom Doe had earlier interacted was at the gate. *Id.* at 88. Doe testified that the agent told Doe to "stand aside," *id.*, then told her to turn around and pointed her out to two police officers, who motioned for her to come to them, *id.* at 99–100.[2] She described the two officers as an African-American woman and an elderly Caucasian man. *Id.* at 100.[3] Officer Anderson testified that when he arrived at Gate 15, he saw

---

[2] Accounting for the police officers' presence, Doe cites an incident report from the Metropolitan Washington Airports Authority report to the effect that a caller from Gate 14 had reported a "drunk in public" at Gate 15. Brauchle Resp. Aff., Ex. J ("MWAA Incident Report"); *see also* Anderson Dep. 70–71.

[3] Although this description could refer to Officer Anderson, who is white, it may not because Officer Anderson is not elderly—he was born in 1986. Anderson Dep. 15.

Doe engaging with a "black male" gate agent.  Anderson Dep. 26–27.  The male gate agent then "pointed to [Doe]" and Officer Anderson and his partner then engaged with her.  *Id.* at 115–16.  Doe testified that they thereafter handcuffed her and "hauled [her] out of there.  They didn't even ask [Doe her] name or for ID."  Doe Dep. 99.

After Doe was arrested, she was transported to the Arlington County Jail ("Jail").  *Id.* at 51–52.  En route, Doe testified, she asked what she was arrested for; the officers told her she was arrested for public intoxication.  *Id.* at 102.  Doe testified that the officers did not read her *Miranda* rights.  *Id.* at 105.

At the Jail, Doe was searched and placed in a holding cell.  *Id.* at 106–07.  Officer Anderson testified that he presented Doe to the magistrate judge, who found probable cause and issued the warrant.  Anderson Dep. 83–85.  Doe testified that the magistrate did not ask her any questions, but explained to Doe that she had been arrested for public intoxication and would have to stay in jail for eight hours.  Doe Dep. at 111–14.  Doe was released at 4 a.m. the following morning.  *Id.* at 109.

Doe appeared at a hearing on October 3, 2012.  *Id.* at 120.  The case was dismissed through a *nolle prosequi*.  *Id.* at 122.  Doe thereafter had the records expunged.  *Id.* at 124–25.

Doe asserts that, although her arrest prevented her from boarding the aircraft, Delta itself never denied her boarding.  Miller, the operations floor manager, testified that if a passenger is denied boarding, the denial would be reflected in the airline's records keyed to the passenger's name.  Miller Dep. 55.  Those records do not reflect that Doe was denied boarding.  *See* Passenger Name Record.

### B.     Procedural History

On September 6, 2013, Doe filed the Complaint, naming Delta as the sole defendant.  She

brought claims of battery, defamation, false arrest, malicious prosecution, and negligence.  Dkt.

1 ("Compl.").  On December 5, 2013, Delta answered, denying liability and claiming, among

other things, that Doe's own conduct had been a cause of the altercation.  Dkt. 7 ("Answer").

On May 4, 2015, the parties filed cross-motions for summary judgment, Dkt. 97, 101, and

supporting memoranda of law, Dkt. 100 ("Delta Br."), 104 ("Doe Br.").  On May 18, 2015, Delta

filed its memorandum of law in opposition to Doe's motion, Dkt. 107 ("Delta Opp. Br."), and on

May 19, 2015, Doe filed her memorandum of law in opposition to Delta's motion, Dkt. 110

("Doe Opp. Br.").  On May 26, 2015, the parties filed reply memoranda.  Dkt. 120 ("Delta Reply

Br."), 117 ("Doe Reply Br.").  On June 19, 2015, the Court heard argument.  Dkt. 127 ("6/19/15

Tr.").

## II.     Legal Standards Governing Summary Judgment Motions

To prevail on a motion for summary judgment, the movant must "show[] that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the absence of a

question of material fact.  In making this determination, the Court must view all facts "in the

light most favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d

Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

To survive a summary judgment motion, the opposing party must establish a genuine

issue of fact by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A);

*see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere

speculation or conjecture as to the true nature of the facts to overcome a motion for summary

judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

**III.    Discussion**

Delta moves on multiple grounds. It argues first that Doe's claims are preempted by the ADA and the FAA. It alternatively pursues summary judgment on the ground that the evidence does not make out a *prima facie* case as to any claim. Doe, for her part, moves for summary judgment, but solely on her battery claim. The Court addresses first Delta's arguments based on preemption; and then addresses, claim by claim, the parties' competing summary judgment motions.

**A.    Preemption Under the ADA**

Under the ADA, "[s]tates may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." 49 U.S.C. § 41713(b)(1). Because common-law tort claims, such as the ones Doe raises here, "are included within the meaning of the ADA, the relevant inquiry is whether the [alleged tortious conduct] is included within the scope of the term 'service.'" *Lozada v. Delta Airlines, Inc.*, No. 13 Civ. 7388 (JPO), 2014 WL 2738529, at *3 (S.D.N.Y. June 17, 2014) (citing *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1994); *Weiss v. El Al Isr. Airlines*, 309 F. App'x 483, 484 (2d Cir. 2009) (summary order); *Farash v. Cont'l*

*Airlines, Inc.*, 574 F. Supp. 2d 356, 362 (S.D.N.Y. 2008), *aff'd*, 337 F. App'x 7 (2d Cir. 2009) (summary order).  Here, Delta argues that Doe's claims are preempted by the ADA because they arise out of Delta's denial of boarding to Doe, and therefore relate to Delta's boarding procedures, a "service" Delta provides.  Delta Br. 11–15.

In applying the statutory term "service," courts in this Circuit have applied the three-part test articulated by then-Judge Sotomayor in *Rombom v. United Air Lines, Inc.*, 867 F. Supp. 214, 222 (S.D.N.Y. 1994).  It inquires (1) "whether the activity at issue in the claim is an airline service"; (2) "if the activity in question implicates a service, the court must then determine whether the claim affects the airline service directly or tenuously, remotely, or peripherally"; and (3) "whether the underlying tortious conduct was reasonably necessary to the provision of the service."  *Id.* at 221–22; *see also Lozada*, 2014 WL 2738529, at *3; *Reed v. Delta Airlines, Inc.*, No. 10 Civ. 1053 (JGK), 2011 WL 1085338, at *4 (S.D.N.Y. March 23, 2011); *Ruta v. Delta Airlines, Inc.*, 322 F. Supp. 2d 391, 400 (S.D.N.Y. 2004); *Farash*, 574 F. Supp. 2d at 363–64 (S.D.N.Y. 2008); *Donkor v. British Airways, Corp.*, 62 F. Supp. 2d 963, 972 (E.D.N.Y. 1999); *id.* at 972 n.5 (collecting cases); *Galbut v. Am. Airlines, Inc.*, 27 F. Supp. 2d 146, 152 (E.D.N.Y. 1997); *Peterson v. Cont'l Airlines, Inc.*, 970 F. Supp. 246, 250 (S.D.N.Y. 1997).

Although the facts in *Rombom* are distinct, the analysis there provides a useful illustration of the application of that test.  Passenger Rombom had boarded a flight, but before it departed, was removed from the plane and arrested by the police.  867 F. Supp. at 216.  Defendant United Air Lines, Inc. ("United") claimed that Rombom had been "rambunctious" during and after the giving of safety instructions; eventually, the captain returned the plane to the gate, where, United claimed, Rombom had refused to deplane unless escorted off by the police.  *Id.*  The police were summoned, and, after a "sharp exchange" with Rombom, arrested her for disorderly

13

conduct.  *Id.*  Defending her conduct, Rombom claimed that she had been talking during the safety instructions, but complied when the attendant asked her to quiet.  *Id.*  Rombom alleged that she had voluntarily exited the plane, but a crew member told the police to place her under arrest.  *Id.* at 217.  Rombom thereafter was arrested and charged with disorderly conduct.  *Id.*

For purposes of analysis, Judge Sotomayor sorted Rombom's tort claims into three sets. She held preempted those based on (1) rude and unprofessional service before the return to the gate and (2) the pilot's decision to return to the gate, because those claims directly implicated an airline service, and, applying the test's third prong, the airline's actions, even viewed in the light most favorable to the plaintiff, were not "outrageous or unreasonable."  *Id.* at 223–24.  But, Judge Sotomayor held, the third set of claims, those stemming from Rombom's arrest, were not preempted.  Rombom had "claim[ed] she departed the plane without arrest and the decision to have her arrested was motivated by spite," *id.* at 224; Judge Sotomayor reasoned that the claims arising from the arrest "are at best tenuously related to an airline service," and that, viewing the facts most favorably to Rombom, an arrest arguably had not been necessary, *id.*

Like the third set of claims in *Rombom*, Doe's claims arise from episodes that occurred in the airport as opposed to on the plane.  Specifically, they arise from two episodes.  Doe's claims of battery and defamation arise out of her interactions with the unidentified African-American male gate agent, who, after Doe had asked him whether she would retain first-class seating, allegedly followed Doe, grabbed her shoulder, and audibly accused her of having been drinking. Doe's claims of false arrest, malicious prosecution, and negligence arose later, at the point of her arrest by the police.  The Court applies the *Rombom* test to those two sets of claims.

### 1.     Doe's battery and defamation claims

Doe's battery and defamation claims arise out of the actions of the African-American male gate agent who followed her in the terminal after she asked about first-class seating. In support of preemption, Delta argues that "Delta's handling of intoxicated and unruly passengers during boarding procedures" is directly related to Delta's "service." Delta Br. 11–14. Doe counters that her claims do not arise out of any airline service, because she was not boarding at the time, and the agent's actions in grabbing her, and publicly accusing her of being intoxicated, do not involve airline services. Doe Opp. Br. 14.

These claims are not preempted. Under Doe's version of events, she was walking in the terminal during the flight delay when, after a difficult conversation regarding her seating, the African-American agent grabbed her shoulder and publicly accused her of having been drinking. Delta is surely correct that its "handling of intoxicated and unruly passengers *during boarding procedures*" constitutes a service. But, at the time when these incidents allegedly occurred, Doe was walking in a terminal, not boarding a plane. And, because Delta has not produced an agent meeting the description given by Doe, there is no evidentiary basis to claim that, in allegedly grabbing and confronting Doe, the agent was then engaged in "boarding procedures." And Delta does not articulate any concrete service to which the agent's confrontation of Doe related—its litigation position, on the contrary, is that this encounter did not occur and that Doe fabricated it. Viewing the facts in the light most favorable to Doe, the Court cannot find that these acts directly implicated any of Delta's services. Thus, Delta's claim of preemption fails, at a minimum, the *Rombom* test's second prong. Doe's battery and defamation claims are not preempted by the ADA.

###### 2.      Doe's false arrest, malicious prosecution, and negligence claims

Doe's second set of claims arise out of her arrest, which, she claims, Delta instigated.  In arguing that these claims are preempted, Delta depicts its personnel's actions in summoning and briefly engaging with the police as rooted in its "refusal to transport her due to unruly behavior and intoxication."  Doe counters that this is not so because her arrest was for public intoxication while in a terminal and because she was never removed from the plane in connection with the arrest.  Indeed, although the point is disputed, Doe argues that there is evidence that, as of the time of her arrest, Delta had never determined to deny her boarding.  *See* Doe Opp. Br. 13–14 (citing Passenger Name Record); *see also* Miller Dep. 55.

It is well established that "[a] flight crew's conduct during the boarding stage of a flight . . . constitutes an airline service within the meaning of Section 41713."  *Peterson*, 970 F. Supp. at 250 (citing *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (air carrier service includes, *inter alia*, ticketing, boarding procedures, baggage handling, and provision of food and drink)); *see also Ruta*, 332 F. Supp. 2d at 400–01.  This set of Doe's claims has a nexus to the boarding stage.  On Doe's version of events, she had gone to the gate to board the flight at the time the gate agent instructed her to stand to the side, leading to her arrest.  Because Doe's claims here relate to her treatment while attempting to board, these claims relate to boarding procedures, an airline service.  The first prong of the *Rombom* test is, thus, met.  The second prong is also met, because these claims challenge how Doe was, allegedly, treated by gate personnel at the point at which she was attempting to board the flight.  Doe's claims thus directly implicate the manner in which Delta and its gate agents interacted with a passenger during, or in close proximity to, the boarding process.  *See D'Engle v. City of New York*, No. 14 Civ. 8236 (GBD), 2015 WL 4476477, at *4 (S.D.N.Y. July 9, 2015); *Lozada*, 2014 WL 2738529, at *4.

16

The third prong of the *Rombom* test, however, is not satisfied, much as it was not met in *Rombom* itself with respect to Rombom's third set of claims, which also included false arrest. That is so for two reasons.

First, as *Rombom* held, a claim is not preempted if it arises out of airline actions that are "outrageous and unreasonable"; and "[c]ourts have deemed conduct outrageous or unreasonable where the plaintiff was arrested . . . or physically injured." *Lozada*, 2014 WL 2738529, at *4 (citing *Peterson*, 970 F. Supp. at 251; *Rombom*, 867 F. Supp. at 224; *Trinidad v. Am. Airlines, Inc.*, 932 F. Supp. 521, 526 (S.D.N.Y. 1996)); *see also Weiss*, 471 F. Supp. 2d at 362 (holding that tortious acts such as assault, battery, false arrest, false imprisonment, and slander can "be described as outrageous or unreasonable"). There is a factual dispute whether Doe was in fact publicly intoxicated at the time Delta called her to the attention of the police. To be sure, the evidence supplies a ready basis on which a jury could find Delta's decision to draw her to the attention of the police, and the police's ensuing decision to arrest her, eminently reasonable: Both flight attendant Hanson and Officer Anderson testified that Doe appeared intoxicated. Delta Br. 14–15 (citing Hanson Dep. 17 and Anderson Dep. 34–35). Doe's restaurant tab, reflecting her having been served four apparently ample glasses of Chardonnay after she had already taken prescription muscle-relaxant medication, memorably corroborates this testimony. And Doe has admitted to some degree of drinking. It is possible that a jury would tarry little before finding that Doe's arrest for public intoxication, far from being false, was amply justified.

But at the summary judgment stage, the Court cannot so presume. Doe contests that she was intoxicated, *see* Doe Dep. 92–93, 109, 114, and at this stage, the Court must view the facts

in the light most favorable to her, as the non-movant.[4] Assuming Doe's account of her sobriety were credited, and that the jury accepted that Delta instigated her arrest out of retaliatory pique, not based on a genuine perception of Doe's intoxication, she, like Rombom, could claim this false arrest was "outrageous" and "unreasonable."

Second, the Delta gate agents, having concluded that Doe was unfit for boarding, were not required to contact the police. Delta's argument is that it was "reasonably necessary" for it to deny Doe boarding, because, under federal regulations, "[n]o certificate holder may allow any person to board any of its aircraft if that person appears to be intoxicated." Delta Br. 13 (citing 14 C.F.R. § 121.575(c)). But denying Doe entry to the plane did not oblige Delta to report her conduct to the police. Delta could have simply refused to permit her to board. And the evidence does not support that Doe resisted the agents, interfered with boarding, or insisted on boarding. On the contrary, Delta's Miller testified that, by the time of Doe's arrest, boarding was completed. Miller Dep. 103.

The analysis as to the false-arrest claim in *Rombom* is in this respect closely on point. Rombom had already boarded the flight, but claimed to have disembarked quietly, only to be arrested later out of malice and spite. Judge Sotomayor denied United's summary judgment

---

[4] Delta acknowledges that "claims founded on arrests . . . based on false factual assertions are not preempted." Delta Br. 15. Delta attempts to undermine Doe's claim of non-intoxication because it is supported only by Doe's "self-serving testimony," Delta Br. 23; Delta Opp. Br. 6, but this argument ignores basic principles governing summary judgment motions. Doe, as a party to the events involving her in the terminal, is as eligible as any percipient witness to supply firsthand testimony; at the summary judgment stage, her testimony that she was not intoxicated must be taken as true, and creates a material dispute of fact. Delta's reliance on *Lozada*, 2014 WL 2738529, at *4, is inapposite. Lozada failed to file a Rule 56.1 statement; her deposition testimony was "inconsistent," *id.*; and she made key concessions and did not deny that she was intoxicated, *id.* at *6. In particular, "her deposition [did] not present controverting facts; it merely consist[ed] of a few general statements that she did not know what was happening . . . [and] she even acknowledge[d] at one point that her behavior was potentially inappropriate." *Id.* at *5. Doe's deposition testimony here is not subject to these infirmities.

motion "[b]ecause significant issues concerning the circumstances leading up to [Rombom's] arrest remain in dispute."  867 F. Supp. at 224.  Here, similarly, Delta has not established that summoning the police and bringing about the arrest of Doe—assuming the evidence permitted a finding that Delta, as opposed to the police, was legally responsible for that arrest, a subject the Court addresses *infra*—was, from the airline's perspective, necessary.

Doe's claims arising out of her arrest and ensuing prosecution thus are not preempted by the ADA.

### C.    Preemption by the FAA

A separate, although similar, preemption doctrine applies under the FAA.  The FAA permits "an air carrier . . . [to] refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety."  49 U.S.C. § 44902(b).  An airline's decision to refuse to transport a passenger is given deference, such that "a refusal [to transport] cannot give rise to a claim for damages under either federal or New York State law unless the carrier's decision was arbitrary and capricious."  *Schaeffer v. Cavallero*, 54 F. Supp. 2d 350, 351 (S.D.N.Y. 1999); *see also Williams v. Trans World Airlines*, 509 F.2d 942, 948 (2d Cir. 1975).  "An airline's discretion to reject a passenger must be accepted if exercised in good faith and for a rational decision.  This deference to the airline's judgment is understandable in light of the fact that the airline must often make such decisions on the spur of the moment, shortly before the plane takes off, and therefore without the benefit of complete and accurate information."  *Ruta*, 322 F. Supp. 2d at 397 (citing *Adamsons v. Am. Airlines, Inc.*, 58 N.Y.2d 42, 47 (1982)). "[S]ince the captain is in command of the aircraft but he has less intimate interactions with passengers than his crew, a 'captain of an airplane is entitled without further inquiry to rely upon a flight attendant's

representations that a . . . passenger might distract the flight attendant from performing his or her safety-related duties.'" *Lozada*, 2014 WL 2738529, at *6 (quoting *Ruta*, 332 F. Supp. 2d at 397–98). To determine if an airline's decision was "arbitrary and capricious," a court must analyze "the facts and circumstances as known by the decision-maker at the time he formed his opinion and whether or not the opinion and decision were arbitrary or capricious in light of those facts and circumstances." *Norman v. Trans World Airlines, Inc.*, No. 98 Civ. 7419 (BSJ), 2000 WL 1480367, at *3 (S.D.N.Y. Oct. 6, 2000); *Williams*, 509 F.2d at 948.

Delta argues that FAA preemption applies here because Moseley, the flight captain, denied Doe boarding, having heard reports from the flight attendants that Doe posed a safety risk. This doctrine, however, does not apply.

Most important, Delta has not established that Doe's claims arise out of a decision to deny her boarding. With respect to the first set of claims, Delta makes no effort to support the claim that the gate agent's alleged grabbing of Doe while she walked in the terminal, or making a loud statement about her drinking, implemented or related to a decision to deny her boarding. On the contrary, because Delta has been unable to identify the agent who allegedly interacted with Doe at that juncture, the record contains no testimony from this agent as to the reasons he acted as he did. A jury could conclude that the events recounted by Doe occurred but were disconnected from the boarding process.

With respect to the second set of claims, which arise from the Delta agents' having drawn her to the police's attention, it is disputed whether the agents so acted as a result of a decision by the pilot to deny Doe boarding. The MWAA Incident Report reflects receiving a call from Gate 14 about Doe, but the record does not establish who placed that call. Upon the police's arrival, both Doe and Officer Anderson testified that it was the unidentified African-American male

agent who pointed out Doe to the officers.  *See* Anderson Dep. 26–27, 115; Doe Dep. 99–100.
With the caller and this agent's identities unknown, however, their reasons for summoning the
police are also not knowable.  And there is testimony that boarding was complete as of the
moment when Doe was arrested.  On this record, a jury could draw different conclusions about
the agents' reasons for summoning the police.  On the one hand, a jury could infer that the arrest
was an attempt to implement a pilot decision to bar Doe from the plane.  On the other hand, the
jury could infer that gate personnel acted on their own initiative, based on their own observations
of the impaired Doe, rather than to implement a pilot directive to deny her transport.

  At the summary judgment stage, the Court must view the facts in the light most favorable
to Doe, as the non-movant, and therefore cannot treat the gate agents' actions summoning the
police as part of a decision to deny Doe transport.  This case thus contrasts with those in which
the FAA has been held to preempt a civil claim.  In each of these cases, the passenger's claim
unavoidably derived from the decision to remove a passenger from a plane.  *See, e.g.*, *Lozada*,
2014 WL 2738529, at *6; *Ruta*, 332 F.2d at 397–98; *Norman*, 2000 WL 1480367, at *2–3; *cf.*
*Schaeffer*, 29 F. Supp. 2d at 185–86.

  Separately, the Court notes that the record leaves a small degree of uncertainty whether a
pilot decision to bar Doe from the plane was ever made.  As noted, Delta's records relating to
Doe do not reflect any decision to deny her boarding.  And the deposition testimony of pilot
Moseley on this point is less than a model of clarity.  Moseley at first testified that he directed
that Doe be denied boarding, then denied recalling whether he had done so, and then returned to
the position that he had denied her boarding:

   **DOE'S COUNSEL:**  So as a captain, ***did you make the decision not—for her not
   to board***, or did you defer to—or how did that work?

> **MOSELEY:**  Pretty much when they came down.  They wanted to put her on, and they made it seem like they wanted to put her on because she was the high status.  And I told them that she's not getting on this airplane if she's inebriated or intoxicated.  That's Part 121 regulations. . . .  We can't allow that.  My flight attendants have informed me that she appears intoxicated, that they're very uncomfortable with this, and she should not be getting on the airplane.  So I said, There's no way that lady should be getting on this airplane, you know, according to what—the information that I have been presented is. . . .  And we just kind of let it go from there.  ***So I don't know if I made the decision or not.***

Moseley Dep. 10–11 (emphasis added).  Later, Moseley testified:

> **DOE'S COUNSEL:**  And in this case, was it you that directed the gate agents that this passenger could not board?

> **MOSELEY:**  Yes.  I informed them that, due to what my flight attendants were saying and the best information I had available, that this lady did not seem appropriate to be on board an aircraft.

*Id.* at 16.  While much of Moseley's testimony thus supports Delta's claim that he decided to deny Doe boarding, it is not conclusive on the point, and a jury could conceivably disbelieve it, particularly given that Delta's records do not validate this claim.

Accordingly, the Court holds, Doe's tort claims are not preempted by the FAA.

### D.    Doe's Tort Claims[5]

Delta pursues summary judgment on all of Doe's claims; Doe, on the battery claim alone.  The Court reviews these claims in the order in which the events underlying each arise.

#### 1.    Battery

Under Virginia law, "[t]he tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 265 Va. 12, 16 (2003) (citing *Washburn v. Klara*, 263 Va. 586 (2002); *Woodbury v. Courtney,* 239 Va. 651 (1990)).  Because "Virginia maintains the common-law definition of assault and battery[, . . . ] the slightest

---

[5] The parties agree that Virginia law applies to Doe's claims.  6/19/15 Tr. 16.

touching may be sufficient to constitute a battery." *Pleasants v. Town of Louisa*, 524 F. App'x

891, 897 (4th Cir. 2013) (citing *Montague v. Virginia*, 278 Va. 532 (2009); *Lynch v. Virginia*,

131 Va. 762 (1921)). "Pursuant to the doctrine of respondeat superior, an employer may be held

liable for torts committed by their agents or employees if the employee was acting within the

scope of his/her employment." *Cole v. Eckerd Corp.*, 54 Va. Cir. 269, 2000 WL 33595085, at *2

(2000) (citing *Plummer v. Center Psychiatrists, Ltd.*, 252 Va. 233 (1996)).

       Doe's battery claim is based on her testimony that, after her initial encounter with the

African-American male agent at Gate 15, he followed her and suddenly grabbed her shoulder

from behind.  Doe Dep. 92.  Both parties move for summary judgment.

       Both motions are meritless.

       Delta's motion is meritless because, crediting Doe's testimony, a jury could conclude that

the agent's grabbing of her shoulder both occurred and was unjustified.  Delta asks the Court to

find Doe's testimony incredible as a matter of law, because, it argues, in other aspects of her

testimony, Doe was demonstrably untruthful.  Among other things, Delta questions Doe's claim

to have not been intoxicated and that the agent who grabbed her wore an "ugly brownish-colored

[Delta] shirt[]," Doe Dep. 84, whereas Delta's evidence is that its gate agents all wear white

shirts and name tags, Martinez Aff., Ex. B. ("Battle Aff."), at 2.  But it is the jury's province, not

the Court's, to determine which portions of Doe's testimony to credit.

        Doe's motion is meritless for two reasons.  First, notwithstanding that she is, as yet, the

only witness to the incident, the jury could disbelieve—as self-serving, fabricated, and/or the

product of inebriation—her claim to have been grabbed by the shoulder.  As Delta notes, the

record supplies ample bases on which a trier of fact could discredit Doe.  Second, even if a jury

credited Doe's factual claim, it could potentially conclude that the agent's unexceptional act in

grabbing her shoulder—an act which Doe does not claim caused her any tangible injury[6]—was justified and/or excused, as a means, for example, of getting Doe's attention for the conversation that followed.

The Court therefore declines to grant summary judgment to either side.  Doe's battery claim will proceed to trial.

### 2.    Defamation

Under Virginia law, to prove defamation, a plaintiff must prove the "(1) publication of (2) an actionable false statement with (3) the requisite intent." *Jafari v. Old Dominion Transit Mgmt. Co.*, 913 F. Supp. 2d 217, 223 (4th Cir. 2012) (quoting *Jordan v. Kollman*, 269 Va. 569, 575 (2005)).  "To be actionable, the statement must be not only false, but also defamatory, that is, it must tend[ ] so to harm the reputation of another as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her]." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (alteration in original) (internal quotation marks and citation omitted).  "Merely offensive or unpleasant statements," however, are not defamatory.  *Id.*  And "pure expressions of opinion" are constitutionally protected and "cannot form the basis of a defamation action." *Williams v. Garraghty*, 249 Va. 224, 233 (1995); *see also Chaves v. Johnson*, 230 Va. 112, 119 (1985) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)).  As to the latter, Virginia law differentiates between "[s]tatements that are relative in nature and depend largely upon the speaker's viewpoint," which are protected "expressions of opinion," *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 132 (2003), and expressions of opinion that "imply an assertion of objective fact," which may be actionable,

---

[6] Doe testified that the touch by the unidentified African-American male agent did not leave any bruises or marks or cause any pain.  Doe Dep. 94–96.

because "[s]imply couching . . . statements in terms of opinion does not dispel these implications," *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). "Whether an alleged defamatory statement is one of fact or of opinion is a question of law to be resolved by the trial court." *WJLA-TV v. Levin*, 264 Va. 140, 156–57 (2002).

Doe's defamation claim here is based on her testimony that the unidentified gate agent confronted her in the terminal and stated to her: "I think that you've been drinking." Doe Dep. 92. Doe testified that she responded: "Well, yes. I've had a glass of wine, but I haven't really been drinking if you talk to the waitress over there." *Id.*[7] Doe testified that "[t]he scene was quite embarrassing because this was taking place right in front of the bar area. . . . [It] attracted attention that . . . this guy [was] chasing me and grabbing me from behind . . . . But then for him to loudly accuse me of drinking also attracted attention." *Id.* These statements were defamatory, Doe claims, because the agent accused her of being intoxicated "in a loud voice in a crowded terminal and restaurant." Doe Opp. Br. 22.

Delta does not challenge the publication element of defamation. But it challenges the defamation claim on two other grounds.

First, Delta argues, the agent's statement that Doe was drinking was truthful, because Doe admitted it in her response to the gate agent. It is correct that, where a plaintiff alleging defamation admits the substantial truth of the defendant's statement, she fails to state a claim. *See Brown v. Shupe*, 629 F. Supp. 760 (E.D. Va. 1985); *Watson v. Spilman*, No. 13 Civ. 746, 2014 WL 3867550, at *7 (E.D. Va. Aug. 5, 2014). And Doe's acknowledgment that "I've had a

---

[7] In her deposition (Doe Dep. 96), Doe later recast the same exchange as follows:

> [H]e said, you know, "I think you've been drinking." I said "That's ridiculous. I've had a glass of wine. You're free to go talk to the waitress over there," and I pointed him out to the waitress who had been serving me the entire time.

glass of wine" could be seen as confirming the agent's statement that Doe had been drinking. But Doe argues that the import of that statement was broader, and communicated that Doe was intoxicated. At the summary judgment stage, Doe's point carries the day. A jury, viewing the statement in context, could reasonably find that the agent's statement connoted that Doe was drunk. *See Chapin*, 993 F.2d at 1092–93 (defamation may be based on false implications of statement, not merely on its literal falsity, provided the language used "affirmatively suggest[s] that the author intends or endorses" the "false innuendo") (citing *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)). Were the jury to credit Doe's testimony that she was not, in fact, intoxicated, it could find the agent's statement false.

Delta's second argument is that "public intoxication is not a crime involving moral turpitude" in Virginia, and therefore "is not defamatory *per se*," and may not be pursued absent proof of special damages, which Doe does not provide. On this point, Delta is correct, and is entitled to summary judgment.

> In Virginia, defamatory words that are actionable *per se* are:
>
> (1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.
> (2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.
> (3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.
> (4) Those which prejudice such person in his or her profession or trade.

*Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713–14 (2006) (citing *Fleming v. Moore*, 221 Va. 884, 889 (1981); *Great Coastal Express, Inc. v. Ellington*, 230 Va. 142, 146–47 (1985) (setting out common law standard for defamation *per se*); *Shupe v. Rose's Stores, Inc.*, 213 Va. 374, 376 (1972) (identifying words at common law which are actionable *per se*)).

Doe argues that the implication that she was publicly intoxicated harmed her reputation. Doe Opp. Br. 22.  But the doctrinally pertinent issue—because, as reviewed below, Doe does not attempt to establish special damages—is whether this statement falls into a limited category of *per se* defamatory statements, as set out in *Tronfeld*.  Under Virginia law, "[c]onvictions of . . . drunkenness . . . are misdemeanors that do not involve moral turpitude."  *Pike v. Eubank*, 197 Va. 692, 700 (1956) (citing *Taylor v. Commonwealth*, 180 Va. 413, 417 (1942); *Burford v. Commonwealth*, 179 Va. 752 (1942); *Bell v. Commonwealth*, 167 Va. 526 (1937)).

Nor does the statement on which Doe's defamation claim is based fit within the other categories.  Public intoxication does not "impute that a person is infected with some contagious disease."  *Tronfeld*, 272 Va. at 714.  And as to the last two categories of defamation *per se*, "[t]o be actionable without proof of 'special damages,' [Virginia courts] have held that the words must contain an imputation that is 'necessarily hurtful' in its effect upon plaintiff's business and must affect [her] in [her] particular trade or occupation."  *Fleming v. Moore*, 221 Va. 884, 889 (1981). Doe, apart from stating in her brief that "[a]ccusing a professional of being drunk in public harms the reputation of another," Doe Opp. Br. 22, does not assert that there is any "nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff," *Fleming*, 221 Va. at 889.  Indeed, while Doe testified that she is an attorney, Doe Dep. 8, she also attested that she did not know whether any person she knew or who knew her, including any client, was present, *id.* at 93.  Doe also testified that she was not unaware of any press coverage of the events at issue, and that no one, aside from her attorneys, has approached her to discuss this incident.  *Id.* at 137.  Doe, who to date has been permitted to pursue this lawsuit pseudonymously, further testified that she did not know of "any

loss of social standings" or of friends occasioned by this incident.  Doe Dep. 138.  It is, therefore,

clear that the statement on which Doe's defamation claim is based was not defamatory *per se*.

Where a defamation action is based on statements not defamatory *per se*, such words may

be actionable only if they "occasion a person special damage." *Carwile v. Richmond*

*Newspapers, Inc.*, 196 Va. 1, 7 (1954).  But here, Doe has not come forward with proof—indeed,

she has not even alleged—special damages.  On the contrary, in her deposition, she testified that,

apart from having a general "fear[] that someone saw something at National Airport," she was

unaware of any specific person, other than her attorneys and the airport and police personnel

involved in the incident, being aware of the alleged events.  Doe Dep. 138.  Even viewing the

facts in the light most favorable to Doe, the Court is compelled to find that Doe has not come

forward with *prima facie* evidence of either defamation *per se* or special damages.  Therefore,

summary judgment is warranted for Delta as to Doe's defamation claim.

### 3.    False arrest

In Virginia, false arrest or imprisonment is a "restraint of one's liberty without any

sufficient cause therefor." *Zayre of Va., Inc. v. Gowdy*, 207 Va. 47, 50 (1966).  A plaintiff

"makes out a case for compensatory damages when [she] shows that [she] has been illegally

detained without lawful process." *Montgomery Ward & Co. v. Wickline*, 188 Va. 485, 490

(1948).  Detention under these circumstances "constitutes false imprisonment." *Samuel v.*

*Rose's Stores, Inc.*, 907 F. Supp. 159, 164 (E.D. Va. 1995) (citing *Zayre*, 207 Va. at 50;

*Montgomery Ward & Co. v. Freeman*, 199 F.2d 720, 723 (4th Cir. 1952) (citing *W.T. Grant Co.*

*v. Owens*, 149 Va. 906) ("[A]ny restraint by fear or force upon the action of another is unlawful

and constitutes false imprisonment unless a showing of justification makes it a true or legal

imprisonment.")))  An arrest at a person's or an entity's "instance and direction" can expose

them to liability for false arrest. *See Wickline*, 188 Va. at 489 (citing *Long v. Eagle 5, 10, & 25¢ Store Co.*, 214 N.C. 146 (1938)); *see also Shah v. Sw. Airlines*, No. 13 Civ. 1481 (AJT) (JFA), 2014 WL 4547160, at *2 (E.D. Va. Mar. 6, 2014) ("In addition to an individual who personally carries out a false arrest, '[a] party who actively instigates, directs, or procures the unlawful arrest of a person is liable for false imprisonment.") (quoting *Smith v. Button*, 43 Va. Cir. 379 (Va. Cir. Ct. 1997)); *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 142 (D.D.C. 2005) ("Courts in Virginia (and neighboring states) have repeatedly permitted a plaintiff to maintain a false imprisonment claim against private-party defendants who did not themselves physically apprehend the plaintiff but rather requested that others do so.").

Here, Doe bases her claim of false arrest on two alleged actions by Delta. The first action, Doe claims, was the directive by a gate agent to her to stand aside of the boarding line. But Doe's testimony as to this episode does not support this claim. Contrary to the allegation in Doe's Complaint, *see* Compl. ¶ 26, Doe did not testify that a gate agent had instructed her to move and not leave. Rather, she testified that, after she approached the gate agent at the podium, "he told me to just step aside." Doe Dep. 98. But this quotidian action by a gate agent does not constitute an arrest (let alone a false one), particularly given Doe's testimony that, after the agent had told her to stand to one side of the boarding line, "there was no reason for [her] to think that [she] wasn't free to walk away." *Id.* at 99.

Second, Doe relies on what she casts as an instruction by Delta to the police to arrest her for public intoxication. But the evidence does not support that Delta so instructed the police or otherwise actively instigated or procured her arrest. The discovery record instead reflects at most two fleeting points of contact between Delta and the police.

29

First, the MWAA Incident Report reflects that a call was placed from a person at Gate 14, who identified himself only as "Alan," to law enforcement, informing them there was a "drunk in public" at that gate.  MWAA Incident Report 1.[8]  The parties dispute whether Gate 14 was Delta-controlled.[9]  But even assuming that call came from a Delta employee, the mere report of a drunken person is not tantamount to a request for an arrest.  The purpose of that call could equally have been to secure help for the intoxicated Doe, or to encourage her to relocate to an area where her remonstrations would be less disruptive.

And, under Virginia law, a person is not liable for false arrest where he or she "merely reports to an officer what was seen and the officer subsequently arrests the person."  *Cole*, 54 Va. Cir. at 272.  Significantly, here, Officer Anderson's testimony was that he decided on his own accord to arrest Doe, based on his own firsthand observation of her intoxication.  Specifically, Officer Anderson recalled that when he and Officer Brown arrived at Gate 15, they saw Doe loudly speaking at the desk.  Anderson Dep. 31.  He further saw that "[s]he was unsteady on her feet, kind of using the desk as support.  When she stood by herself, she was a little bit swayed.  When I introduced myself and she was talking over me, she smelled of an alcoholic beverage

---

[8] Discovery did not conclusively establish who "Alan" is.  A Delta gate agent named Alan Reed was working at the terminal in September 2012.  He is deceased and was not deposed.  Miller Dep. 30–31; Sanchez-Concha Dep. 14–15.

[9] Miller, the Delta operations floor manager, testified that Gate 14 is no longer Delta-operated, and that he was "not sure" whether it was Delta-operated in September 2012.  Miller Dep. 29–30.  Doe relies on the testimony of Delta's Miller and Sanchez, but the cited testimony of those witnesses establishes only that the phone number from which the call to the police was made regarding Doe is the Gate 14 phone number.  Miller Dep. 35; Sanchez-Concha Dep. 13.  It does not establish that this phone number was affiliated with Delta.  Officer Anderson, too, testified that he does not know whether the call to the police from Gate 14 was made by a Delta agent.  Anderson Dep. 71–72.  That said, the fact that, upon Officer Anderson's arrival at Gate 15, the unidentified African-American male Delta agent pointed to Doe supplies some circumstantial evidence that the prior call was made by a Delta employee.

emanating from her person.  She had slurred speech." *Id.* at 31–32.  Officer Anderson further

testified that he determined that Doe was intoxicated as he approached her, due to "the way she

was acting towards the Delta representative, her stance.  When I introduced myself at close

distance, smelled an alcoholic beverage emanating from her person.  Her slurred speech. She was

not trying to have a conversation with me reasonably." *Id.* at 34–35.  Officer Anderson

concluded that, "[w]hen [Doe] wouldn't respond to me at all and she was still going about her

conversation or how upset she was, I made the decision that she is unable to take care of herself

in that time, so I placed her under arrest and told her she was under arrest for drunk in public."

*Id.* at 37.  The MWAA Incident Report is not to the contrary:  It does not reflect a request for an

arrest, but merely describes in a single word, Doe's intoxicated status.[10]

     The only other moment of contact between Delta and the police was when Officer

Anderson arrived at the gate, and the unidentified African-American male agent, according to

Anderson and Doe, pointed to Doe.  *See* Anderson Dep. 115–16; Doe Dep. 99–100.  But there is

no testimony that this gesture was accompanied by a request for an arrest.  On the facts at hand,

it was no more than another means of pointing out Doe to the police; indeed, Doe testified that

the agent's "pointing to [her] to the officers . . . was, like, this hand signal going on, like, yeah,

she's the one." *Id.* at 100; *see Button*, 43 Va. Cir. at 379 ("Identifying words such as 'This is

him' is not in and of itself sufficient 'participation' to render a defendant liable for false

imprisonment.").

     Doe points out that, according to the MWAA Incident Report, the officers arrived at the

scene at 7:43 p.m. and placed Doe in custody at 7:44 p.m.  From this, Doe infers that the police

arrested her at Delta's request.  But that inference does not follow.  Upon arriving at the scene

---

[10] The MWAA Incident Report states that the offense is "Intoxication."

and seeing—and smelling—Doe's intoxication, no further investigation was necessary before placing her under arrest. The short passage of time between Anderson's arrival and the arrest says nothing about any preceding request, let alone an arrest request, from Delta.

Even viewing the facts in the light most favorable to Doe, Doe has failed to adduce non-speculative evidence that Delta requested her arrest. Because Doe has not come forward with *prima facie* evidence of a false arrest, summary judgment is merited for Delta on Doe's false arrest claim.

### 4.      Malicious prosecution

"Malicious prosecution actions are not favored in Virginia, because of the chilling effect that such litigation might have on the efforts of citizens to bring criminals to justice." *Niese v. Klos*, 216 Va. 701, 703 (1976) (citing *Brodie v. Huck*, 187 Va. 485, 489 (1948)). To maintain a malicious prosecution action, a plaintiff must prove "by a preponderance of the evidence that the prosecution was (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Hudson v. Lanier*, 255 Va. 330, 333 (1998) (citing *Lee v. Southland Corp.*, 219 Va. 23, 26 (1978)); *see also Giant of Va., Inc. v. Pigg*, 207 Va. 679, 683 (1967) (citing *Wiggs v. Farmer*, 205 Va. 149, 152 (1964)).

The evidence here fails to support the second required element—that the prosecution had been instituted by, or with the cooperation of, Delta. As explained above, Delta is not even accountable for Doe's arrest—the evidence adduced shows only that (1) a person, possibly but not definitively, a Delta employee, reported her intoxication to the police and (2) upon the police's arrival at the terminal, a Delta employee pointed Doe out. Notably, there is no evidence that Delta took any action relevant to Doe after her arrest. Under these circumstances, Delta

32

cannot be said to have "affirmatively, actively, and voluntarily [taken] steps to instigate or to participate in the arrest of the defendant" or to have "exercised some level of control over the decision to have the plaintiff arrested." *Bennett v. R&L Carriers Shared Servs., LLC*, 744 F. Supp. 2d 494, 512 (E.D. Va. 2010).   Barring a showing of lack of a good faith belief as to the facts reported, a person who "simply report[s] the occurrence of events to the police" or "g[ives] information to the police" "cannot be liable for malicious prosecution." *Id.*  Doe cannot make such a showing as to the states of mind of the unidentified persons responsible for calling the police's attention to her.  Summary judgment is, therefore, warranted as to Doe's malicious prosecution claim.

### 5.      Negligence

Under Virginia law, to establish a *prima facie* negligence claim, a plaintiff must establish that the defendant owed her a legal duty, that there was a breach of that duty, and that the breach of duty was the proximate cause of injury that resulted in damage to the plaintiff.  *See Blue Ridge Serv. Corp. of Va. v. Saxon Shoes, Inc.*, 271 Va. 206, 218 (2006) (citing *Trimyer v. Norfolk Tallow Co.*, 192 Va. 776, 780 (1951)); *see also Fisher v. Delta Airlines*, No. 09 Civ. 576 (HEH), 2009 WL 3193151, at *1 (E.D. Va. Oct. 5, 2009).   Doe's claim here is that Delta was negligent because it failed to follow its internal recommended procedures governing a passenger's apparent intoxication.  These recommended procedures entail "mak[ing] a determination of intoxicated appearance, request[ing] a supervisor or man[a]ger, advis[ing] the passenger that she will not be permitted to board, rebook[ing] for a later flight, ask[ing] the passenger i[f] they have a disability or is on medication."  Doe Opp. Br. 21 (citing Brauchle Resp. Aff., Ex. M, "Delta Recommended Procedures").  Doe faults Delta for not taking these sequential recommended steps, but instead moving immediately to the final recommended step: "contact local law

enforcement as necessary." *Id.* (internal quotation marks omitted) (citing Delta Recommended Procedures).

Doe's negligence claim fails, however, because Delta's failure to follow its own internal procedures is not tantamount to negligence.  Nothing in Virginia law required Delta to heed these internal procedures, which in any event Delta denoted as "recommended," not mandatory.  While common carriers owe a heightened duty of care to passengers, *see Jackson v. United Airlines, Inc.*, No. 08 Civ. 182 (DWD), 2009 WL 1036068, at *10–11 (E.D. Va. Apr. 17, 2009) (citing *Taboada v. Daly Seven, Inc.*, 271 Va. 313, 325 (2006); *Shamblee v. Va. Transit Co.*, 204 Va. 591, 593 (1963)), the content of these duties under Virginia law is not set by a particular carrier's internal manual.  Virginia law is in fact flatly to the contrary.  As the Virginia Court of Appeals long ago stated, "[a] person cannot, by the adoption of private rules [*i.e.*, a company's policies], fix the standard of his duty to others. . . .  Private rules may require of employe[e]s less or more than is required by law; and whether a given course of conduct is negligent, or the exercise of reasonable care, must be determined by the standard fixed by law, without regard to any private rules of the party." *Virginia Ry. & Power Co. v. Godsey*, 117 Va. 167, 167 (1915).  "[I]t would be a harsh measure of justice to hold that a plaintiff should be permitted to exact of the company the standard of duty required by such rules.  The plaintiff sues for the violation of duty imposed by law, not for the violation of special rules about which she knew nothing." *Id.*; *see also Riverside Hosp., Inc. v. Johnson*, 272 Va. 518, 529 (2006); *Jordan v. Wicks*, No. 83-0434, 1984 WL 283889, at *1–2 (Va. Cir. Ct. July 13, 1984).

Because Doe has failed to establish that Delta owed her a legal duty to follow its own recommended procedures as to the handling of intoxicated passengers, summary judgment is merited for Delta on Doe's negligence claim.

34

## CONCLUSION

For the reasons set forth above, the Court grants Delta's motion for summary judgment as to all Doe's claims, save for her claim of battery. As to that claim, the Court denies both parties' motions for summary judgment. The Clerk of Court is respectfully directed to terminate the motions pending at docket numbers 97 and 101.

This case will now proceed to a jury trial. The Court's staff will contact counsel shortly to schedule such a trial, which the Court expects will be held in October or November.


SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 10, 2015
       New York, New York

35